Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| BANCO POPULAR DE PUERTO RICO<br><br>RECURRIDO<br><br>v.<br><br>CHALLENGER BRASS & COOPER CO., ABIMAEL PADILLA NEGRÓN, KASSANDRA A. PAGÁN MEDINA Y OTROS<br><br>PETICIONARIOS | TA2026CE00127 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm. BY2023CV03279<br><br>Sobre: Cobro de Dinero – Ordinario, Ejecución de Hipoteca: Propiedad Comercial |
|---|---|---|

Panel integrado por su presidenta, la Juez Lebrón Nieves, el Juez, Pagán Ocasio y la Jueza Álvarez Esnard.

Pagán Ocasio, juez ponente

# SENTENCIA

En San Juan, Puerto Rico, a 9 de marzo de 2026

## I.

El 3 de febrero de 2026, Challenger Brass & Cooper Co. (Challenger Brass), Abimael Padilla Negrón, Kassandra Pagán Medina y la Sociedad Legal de Bienes Gananciales compuesta por ambos (matrimonio Padilla-Pagán), y Whesley Sepúlveda Rodríguez, Agnes Díaz Rivera y la Sociedad Legal de Bienes Gananciales compuesta por ambos (matrimonio Sepúlveda-Díaz) (en conjunto, la parte peticionaria) presentaron una *Petición de Certiorari* en la que solicitaron que revoquemos una *Resolución* emitida el 18 de septiembre de 2025, notificada al próximo día, por el Tribunal de Primera Instancia, Sala Superior de Bayamón (TPI o foro primario).[1] En el aludido dictamen, el TPI acogió una solicitud de reconsideración instada por el Banco Popular de Puerto Rico (BPPR

---

[1] Véase Entrada Núm. 1 del recurso en el Sistema Unificado de Manejo y Administración de Casos del Tribunal de Apelaciones (SUMAC-TA).

o parte recurrida) y ordenó la continuación del procedimiento de ejecución de sentencia contra Challenger Brass.

El 4 de febrero de 2025, emitimos una *Resolución* en la que concedimos a la parte recurrida hasta el 13 de febrero de 2026, para exponer su posición sobre los méritos del recurso.[2]

En cumplimiento, el 13 de febrero de 2026, el BPPR presentó su *Oposición a expedición del auto de Certiorari y Solicitud de desestimación,* en la que sostuvo que el foro primario no había cometido los errores imputados por la parte peticionaria. Consecuentemente, suplicó que desestimemos el recurso e impusiéramos sanciones y honorarios de abogado a la parte peticionaria o, en la alternativa, deneguemos la expedición del auto de *Certiorari.*[3]

El 17 de febrero de 2026, emitimos otra *Resolución* mediante la cual concedimos a la parte peticionaria hasta el 27 de febrero de 2026, para expresarse en cuanto a la solicitud de desestimación instada por el BPPR.[4]

Transcurrido el término concedido a la parte peticionaria para que expusiera su posición sobre la solicitud de desestimación, sin que lo hiciera, damos por perfeccionado el recurso de *certiorari.* En adelante, pormenorizamos los hechos procesales más relevantes a la atención del recurso.

**II.**

El caso de marras tuvo su génesis el 14 de junio de 2023, cuando las partes de epígrafe presentaron de manera conjunta una *Demanda solicitando que se dicte sentencia por consentimiento* sobre cobro de dinero y ejecución de hipoteca.[5] En esta, sostuvieron que el 28 de octubre de 2022, habían suscrito un documento intitulado

---

[2] Íd., entrada núm. 2.
[3] Íd., entrada núm. 3.
[4] Íd., entrada núm. 4.
[5] Véase Entrada Núm. 1 del expediente digital del caso en SUMAC del Tribunal de Primera Instancia (SUMAC-TPI).

*Forbearance Agreement* (el Acuerdo), el cual anejaron a su escrito.[6] Conforme surge de este, el 24 de mayo de 2019, Challenger Brass y BPPR suscribieron un Contrato de Préstamo #101-0900-2372649-1001 mediante el cual, la parte recurrida concedió a Challenger Brass una línea de crédito rotativa por la suma principal de $2,000,000, con el propósito de financiar cuentas e inventario, y cancelar una línea de crédito existente. Posteriormente, el 19 de marzo de 2021, BPPR y Challenger Brass otorgaron el Contrato de Préstamo #101-0900-2372649-2001, en virtud del cual BPPR concedió una línea de crédito no rotativa por una cuantía principal de $600,000 con el propósito de financiar la adquisición de material crudo para cumplir con un contrato entre Challenger Brass y un tercero. Cabe señalar que, según se desprende del documento, ambos contratos de préstamo fueron garantizados con una propiedad inmueble perteneciente a Challenger Brass y otras garantías personales e ilimitadas de los matrimonios Padilla-Pagán y Sepúlveda-Díaz.[7]

Por virtud del Acuerdo, las partes de epígrafe acordaron que, siempre y cuando la parte peticionaria cumpliera con las obligaciones de pago allí pactadas —dirigidas a subsanar una serie de incumplimientos reiterados— el BPPR se abstendría de ejecutar su colateral hasta el 30 de junio de 2023, o hasta que se produjera un evento de incumplimiento bajo el Acuerdo, lo que ocurriera primero.

Tras el incumplimiento de la parte peticionaria con el Acuerdo, se presentó la demanda en cuestión y se solicitó al foro primario que se emitiera sentencia por consentimiento, condenando a la parte peticionaria a satisfacer las sumas adeudadas,

---

[6] Véase Anejo 1 de la Entrada Núm. 1 en SUMAC-TPI. Hacemos constar que el Acuerdo fue otorgado por Challenger Brass como deudor y los matrimonios Padilla-Negrón y Sepúlveda-Díaz como garantizadores.

[7] Véase Anejo 1 de la Entrada Núm. 1 en SUMAC-TPI, págs. 30-32.

reconocidas y admitidas en el Acuerdo, bajo apercibimiento de venta en pública subasta de la propiedad en garantía. La parte peticionaria suscribió el documento.

Luego de varias incidencias procesales, el 26 de junio de 2023, notificada el 29 de junio de 2023, el foro primario emitió *Sentencia por Consentimiento*.[8] En virtud de esta, el foro primario consignó treinta (30) determinaciones de hechos y condenó a la parte peticionaria a pagar al BPPR: (1) una suma no menor de $1,202,9446.73 relacionada al Contrato de Préstamo #101-0900-2372649-1001, por concepto de principal más intereses acumulados y no pagados, (2) una suma no menor de $583,494.80 en atención al Contrato de Préstamo #101-0900-2372649-2001, por concepto de principal más intereses acumulados y no pagados y, (3) una suma agregada de $110,000 por concepto de costas, gastos y honorarios de abogados, según pactado por las partes.[9]

Consecuentemente, el TPI ordenó que se procediera con la venta en pública subasta de la propiedad que garantizaba el pago.

No obstante lo anterior, el 26 de diciembre de 2023, la parte recurrida presentó una *Solicitud para que se vuelva a notificar sentencia por consentimiento*.[10] Por medio de esta, sostuvo que Challenger Brass había radicado una petición de quiebra ante el Tribunal de Quiebras de Puerto Rico, en el caso 23-01917-11, previo a que el TPI emitiera la *Sentencia por Consentimiento*. Esgrimió que, a pesar de ello, dicha petición había sido desestimada el 22 de diciembre de 2022, por lo que solicitó que se volviera a notificar la *Sentencia por Consentimiento*.

---

[8] Véase Entrada Núm. 8 en el SUMAC-TPI.
[9] Hacemos constar que, según dispuesto por el TPI, las sumas de dinero relacionadas a los contratos de préstamos acumulaban intereses hasta su pago total.
[10] Véase Entrada Núm. 9 en el SUMAC-TPI.

El 9 de enero de 2024, el foro primario ordenó a Secretaría a notificar nuevamente el dictamen en cuestión.[11] En esa misma fecha, la Secretaría del TPI emitió la notificación correspondiente.[12]

Más adelante, el 24 de enero de 2024, la parte recurrida instó una *Solicitud de Ejecución de Sentencia,* a los fines de que el foro primario expidiera la Orden y el Mandamiento de ejecución de la *Sentencia por Consentimiento* y se procediera a diligenciar el mismo mediante la venta en pública subasta del inmueble.[13]

Sin embargo, el 29 de febrero de 2024, la parte peticionaria instó un escrito intitulado *Acción independiente de nulidad de sentencia, Solicitud de remedios y Oposición a Solicitud de ejecución de sentencia.*[14] En esencia, adujo que la *Sentencia por Consentimiento* resultaba nula, debido a que no había sido notificada nuevamente. Añadió que había sido coaccionada a prestar consentimiento para la demanda conjunta, por lo que procedía la nulidad.

El 19 de marzo de 2023, la parte recurrida presentó su oposición a la moción antes reseñada.[15] En esta, adujo que el dictamen sí había sido notificado a la parte peticionaria el 9 de enero de 2024, por conducto de su representación legal de entonces. Añadió que los argumentos sobre la alegada coacción eran falsos y solo constituían un intento para justificar el reiterado incumplimiento con sus obligaciones de pago.

El 2 de mayo de 2024, la parte peticionaria presentó una *Réplica a Oposición de la parte demandante de epígrafe* en la que insistió en que la referida sentencia no había sido notificada luego de que se le relevara del proceso de quiebra, por lo que resultaba

---

[11] Íd., entrada núm. 10.
[12] Véase segunda notificación en la Entrada Núm. 8 en el SUMAC-TPI.
[13] Véase Entrada Núm. 11 en el SUMAC-TPI.
[14] Íd., entrada núm. 17.
[15] Íd., entrada núm. 19.

nula.[16] Asimismo, reiteró que suscribió el Acuerdo bajo coacción y engaño.

El 20 de mayo de 2024, el BPPR instó una *Dúplica a "Réplica a oposición de la parte demandante de epígrafe" (SUMAC #29)* mediante la cual reafirmó su postura en cuanto al asunto.[17]

Atendidos los escritos de las partes, el 30 de agosto de 2024, el TPI emitió una *Resolución* en la que declaró No Ha Lugar la solicitud de relevo de sentencia presentada por la parte peticionaria.[18] Conjuntamente, emitió una *Sentencia por Consentimiento Nunc Pro Tunc*, a los fines de dejar establecido que la fecha de la sentencia correspondía al 9 de enero de 2024, según constaba en el expediente.[19]

Así las cosas, el 12 de septiembre de 2024, BPPR presentó una *Moción de Ejecución de Sentencia* para que el foro primario expidiera la Orden y el Mandamiento de ejecución de la *Sentencia por Consentimiento Nunc Pro Tunc*.[20]

Empero, el 16 de septiembre de 2024, la parte peticionaria presentó una *Moción de Reconsideración de Sentencia, Resolución y en Oposición a Moción de Ejecución de Sentencia*.[21] Por medio de esta, sostuvo que el foro primario estaba impedido de utilizar el mecanismo de enmienda *nunc pro tunc* para modificar la fecha de la *Sentencia por Consentimiento*, puesto que el cambio no obedecía a un mero error de forma. En vista de ello, insistió en que el dictamen era nulo por falta de notificación.

En el ínterin, el 13 septiembre de 2024, notificada el 17 de septiembre de 2024, el TPI emitió una *Orden de Ejecución de Sentencia* y expidió el *Mandamiento de Ejecución de Sentencia*.[22]

---

[16] Íd., entrada núm. 29.
[17] Íd., entrada núm. 32.
[18] Íd., entrada núm. 33.
[19] Íd., entrada núm. 34.
[20] Íd., entrada núm. 35.
[21] Íd., entrada núm. 36.
[22] Íd., entradas núm. 37 y 38.

Inconforme también con dicha determinación, el 26 de septiembre de 2024, la parte peticionaria presentó otra *Moción de Reconsideración de Orden y Mandamiento de Ejecución de Sentencia* en la cual afirmó nuevamente que la *Sentencia por Consentimiento* no había sido notificada, por lo que resultaba nula.[23] Subrayó además que, dicho error no era susceptible de corrección por medio del mecanismo de enmienda *nunc pro tunc*.

El 16 de octubre de 2024, el BPPR instó un escrito intitulado *Oposición a las mociones de reconsideración presentadas por la parte demandada (SUMAC #36 y #40) y Solicitud de sanciones*.[24] Sostuvo firmemente que, el dictamen en controversia sí había sido notificado y la enmienda de fecha a la sentencia sí podía realizarse a través del mecanismo *nunc pro tunc*. Adicionalmente, adujo que la enmienda en cuestión se retrotraía a la fecha original del dictamen, por lo que cualquier solicitud de reconsideración en relación a este resultaba tardía.

El 23 de octubre de 2024, el foro primario emitió dos (2) *Resoluciones*. En virtud de la primera, declaró No Ha Lugar la solicitud de reconsideración presentada por la parte peticionaria el 16 de septiembre de 2024.[25] Por medio de la segunda, declaró No Ha Lugar la moción de reconsideración instada por la parte peticionaria el 26 de septiembre de 2024.[26]

En desacuerdo aún, el 22 de noviembre de 2024, la parte peticionaria presentó un recurso de *certiorari* ante esta Curia, en el caso KLCE202401274.[27] No obstante, un panel hermano de este Tribunal denegó su expedición mediante *Resolución* emitida el 19 de diciembre de 2024.[28] Cabe señalar que, la parte peticionaria instó

---

[23] Íd., entrada núm. 40.
[24] Íd., entrada núm. 42.
[25] Íd., entrada núm. 44.
[26] Íd., entrada núm. 45.
[27] Íd., entrada núm. 47.
[28] Íd., entrada núm. 50.

una solicitud de reconsideración en torno a dicha denegatoria, pero esta fue declarada No Ha Lugar el 16 de enero de 2025.[29]

Todavía insatisfecha, el 13 de febrero de 2025, la parte peticionaria incoó una petición de *certiorari* ante el Tribunal Supremo de Puerto Rico en el caso CC-2025-0078, la cual fue declarada No Ha Lugar el 7 de marzo de 2025.[30]

De vuelta al foro primario, el 24 de junio de 2025, la parte recurrida presentó una *Moción informativa sobre continuación de procedimientos de ejecución de sentencia* en la que informó que continuaría con el procedimiento de ejecución de la *Sentencia por Consentimiento Nunc Pro Tunc*.[31]

Luego, el 2 de agosto de 2025, la parte peticionaria instó una *Urgente Moción solicitando la paralización de los procedimientos* en la que solicitó la paralización de los procedimientos, toda vez que el señor Abimael Padilla Negrón (señor Padilla Negrón) había radicado una petición de quiebra ante la Corte de Quiebras, bajo el Capítulo 13 del Código de Quiebras, 11 U.S.C.A. sec. 101 *et seq.*[32]

El 4 de agosto de 2025, BPPR se opuso mediante una *Oposición a Urgente Moción solicitando paralización de los procedimientos (ENT #64)*.[33] A grandes rasgos, sostuvo que la paralización automática dispuesta por el Código de Quiebras, no impedía actos contra codeudores o garantizadores que no se acogían a las protecciones de dicho estatuto. Añadió que dicha paralización no aplicaba a personas jurídicas, sino que solo se extendía a individuos codeudores. En ese sentido, y toda vez que el señor Padilla Negrón constituía el único deudor en quiebra, sostuvo que no existía impedimento alguno para que los procedimientos post-

---

[29] Íd., entrada núm. 51.
[30] Íd., entradas núm. 52 y 56.
[31] Íd., entrada núm. 58.
[32] Íd., entrada núm. 64. A la petición de quiebra se le asignó el siguiente número de caso: 23-03486-13.
[33] Véase Entrada Núm. 65 en el SUMAC-TPI.

sentencia continuaran en contra de Challenger Brass y los matrimonios Pagán-Medina y Sepúlveda-Díaz.

El 4 de agosto de 2025, notificada al próximo día, el foro primario emitió *Orden* a través de la cual concedió un término de diez (10) días a la parte peticionaria para mostrar causa por la cual el Tribunal "no debía continuar los procedimientos post-sentencia en contra de Challenger Brass, Pagán-Medina y los Sepúlveda-Díaz y solamente paralizar los procedimientos post sentencia instados contra los codemandados Padilla-Negrón."[34]

La parte peticionaria incumplió con la referida *Orden*, por lo que el 28 de agosto de 2025, el TPI paralizó los procedimientos post-sentencia únicamente contra el señor Padilla Negrón.[35]

El mismo 28 de agosto de 2025, BPPR presentó una *Moción informativa* donde expuso que el señor Whesley Sepúlveda Rodríguez (señor Sepúlveda Rodríguez) también había radicado una petición de quiebra bajo el Capítulo 13 del Código de Quiebras, *supra*, secs. 1301-1330, ante la Corte de Quiebras.[36] Ante ello, solicitó que los procedimientos post-sentencia contra este también fueran paralizados.

En igual fecha, el foro primario paralizó los procedimiento post-sentencia contra el señor Sepúlveda Rodríguez, mediante *Resolución Interlocutoria: Segunda Paralización Parcial.*[37]

El 29 de agosto de 2025, la parte peticionaria presentó otra *Urgente Moción solicitando la paralización de los procedimientos y se deje sin efecto subasta.*[38] Por medio de esta, manifestó que, pese a que Challenger Brass constituía una entidad jurídica separada, tanto este como sus activos formaban parte integral del patrimonio

---

[34] Íd., entrada núm. 66.
[35] Íd., entrada núm. 68.
[36] Íd., entrada núm. 69. A la petición de quiebra se le asignó el número de caso 25-03256.
[37] Véase Entrada Núm. 70 en el SUMAC-TPI.
[38] Íd., entrada núm. 73.

de los señores Padilla Negrón y Sepúlveda Rodríguez. Manifestó que los bienes corporativos podían ser administrados en quiebra, por lo que procedía extender la paralización a estos para preservar el patrimonio.

El mismo 29 de agosto de 2025, el TPI emitió *Orden* en la cual acogió la solicitud de la parte peticionaria y paralizó todos los procedimientos post-sentencia en el caso, hasta que otra cosa se dispusiera.[39]

También el 29 de agosto de 2025, el BPPR presentó una *Moción Informativa en torno a "Urgente Moción" (ENT #73) y Orden de Paralización (ENT #75).*[40] En lo pertinente, advirtió que la petición de quiebra instada por el señor Padilla Negrón había sido desestimada.

Más adelante, el 1 de septiembre de 2025, la parte recurrida presentó una *Urgente Oposición a "Urgente Moción" (ENT #73), Solicitud de reconsideración de Orden de paralización (ENT #75) y para que se reinstalen las fechas de subasta.*[41] Sostuvo que la paralización automática solo le aplicaba a los señores Padilla Negrón y Sepúlveda Rodríguez, quienes eran los únicos que habían radicado peticiones de quiebra bajo el Capítulo 13 del Código de Quiebras, *supra.* Asimismo, esgrimió que la paralización no se extendía a los demás codemandados puesto que el préstamo otorgado era comercial. Adicionalmente, manifestó que la propiedad sujeta a la subasta era propiedad de Challenger Brass, como único titular registral, a quien, por constituir una corporación, no le aplicaba la paralización automática. A tenor con lo anterior, indicó que no existía impedimento legal alguno para que el procedimiento continuara en contra de Challenger Brass.

---

[39] Íd., entrada núm. 75.
[40] Íd., entrada núm. 76.
[41] Íd., entrada núm. 78.

El 5 de septiembre de 2025, notificada el 8 de septiembre de 2025, el foro primario emitió *Orden* en la que dio por sometido el asunto y mantuvo la paralización de los procedimientos post-sentencia.[42]

Posteriormente, el 18 de septiembre de 2025, notificada al próximo día, el TPI emitió una *Resolución Interlocutoria*[43] en la que dispuso lo siguiente:

> Evaluado el expediente acogemos la reconsideración presentada por la parte demandante Banco Popular de Puerto Rico. Surge del expediente judicial que el inmueble que se ha de ejecutar le pertenece a Challenger Brass [&] Co., Inc. y no a los codemandados acogidos a las protecciones de la Ley de Quiebras. No existe motivo para paralizar el pleito en lo que concierne a Challenger Brass [&] Co., Inc. ("Challenger Brass"). Entendiéndose, que [sí] procede ejecutar la sentencia en lo que concierne a Challenger Brass [&] Co., Inc.

En desacuerdo con el curso decisorio del TPI, la parte peticionaria acudió, nuevamente, ante este foro revisor el 20 de octubre de 2025, mediante recurso de *certiorari* en el Caso Núm. TA2025CE00646[44], y formuló el siguiente señalamiento de error:

> Erró y abusó de su discreción el foro de instancia al dejar sin efecto su determinación de paralizar el caso de epígrafe en cuanto a todos los codemandados de este caso y ordenar la ejecución de su sentencia en cuanto al codemandado Challenger Brass & Cooper, pese a que dicha compañía tiene activos y es parte integral del patrimonio de las partes codemandadas en este caso, Abimael Padilla y Whesley Sepúlveda.

Junto a su recurso, la parte peticionaria presentó una *Moción en Auxilio de Jurisdicción* solicitando la paralización de los procedimientos.[45]

El 21 de octubre de 2025, un panel hermano de esta Curia emitió *Resolución* mediante la cual ordenó la paralización de los procedimientos.[46] Luego, el 30 de octubre de 2025, ese mismo panel

---

[42] Íd., entrada núm. 79.
[43] Íd., entrada núm. 82.
[44] Íd., entrada núm. 83.
[45] Véase Entrada Núm. 2 del expediente digital del caso TA2025CE00646 en el SUMAC-TA.
[46] Íd., Entrada Núm. 3.

emitió una *Resolución* mediante la cual denegó la expedición del recurso de *certiorari* y ordenó la continuación de los procedimientos ante el foro primario sin mayor dilación.[47]

Así las cosas, el 4 de noviembre de 2025, la parte recurrida presentó una *Moción informativa* en la que hizo constar que, de conformidad a lo resuelto por este Tribunal de Apelaciones, continuaría con los procedimientos post-sentencia.[48] En vista de ello, solicitó al TPI la designación de nuevas fechas para la celebración de la subasta.

Tras diversos trámites procesales innecesarios pormenorizar, el 4 de diciembre de 2025, el foro primario emitió *Orden: Se levanta la Paralizaci[ó]n* mediante la cual suspendió la paralización de los procedimientos y ordenó a la Oficina de Alguaciles a reanudar el procedimiento de subasta.[49]

Nuevamente en desacuerdo, el 18 de diciembre de 2025, la parte peticionaria presentó una *Moción de Reconsideración (Entrada Número 98).*[50] En resumidas cuentas, solicitó una vez más la paralización de los procedimientos. En apoyo a su argumento, sostuvo que el día anterior, a saber, el 17 de diciembre de 2025, había presentado un recurso de *certiorari* ante el Tribunal Supremo, el cual versaba sobre el asunto de la paralización, y "como un acto de prudencia y deferencia al máximo Foro Judicial" se debían paralizar los procedimientos en el caso. Adicionalmente, insistió en que todos los demandados se habían acogido al proceso de quiebra, por lo que procedía la paralización inmediata.

El 22 de diciembre de 2025, la parte peticionaria presentó una *Moción Informando presentación de Recurso* mediante la cual notificó formalmente al foro primario sobre la presentación de la petición de

---

[47] Íd., Entrada Núm. 7. Véase también Entrada Núm. 86 en el SUMAC-TPI.
[48] Véase Entrada Núm. 86 en el SUMAC-TPI.
[49] Íd., entrada núm. 98.
[50] Íd., entrada núm. 99.

*certiorari* ante el Tribunal Supremo de Puerto Rico, en el caso CC-2025-0903.[51]

El 7 de enero de 2026, el BPPR presentó su *Oposición a "Moción de Reconsideración" (ENT 99)*.[52] En esta, señaló que la petición de quiebra del señor Sepúlveda Rodríguez también había sido desestimada por la Corte de Quiebras, incluso previo a la presentación del recurso de *certiorari* ante el Tribunal Supremo. En ese sentido, y ante la inactividad de las dos (2) peticiones de quiebra, sostuvo que la parte peticionaria estaba impedida de invocar la paralización automática.

Evaluados los escritos de las partes, el 8 de enero de 2026, notificada al próximo día, el TPI emitió una *Resolución Interlocutoria* en la que rechazó acoger la solicitud de reconsideración instada por la parte peticionaria.[53]

Inconforme aún, el 3 de febrero de 2026, la parte peticionaria acudió, nuevamente ante nos, mediante el recurso que nos ocupa y le imputó al TPI la comisión de los siguientes errores:

A. Erró y abusó de su discreción el foro de instancia al no paralizar el caso de epígrafe, pese a la vigencia del auto de certiorari ante el Tribunal Supremo de Puerto Rico de la parte recurrente que versa sobre precisamente sobre la naturaleza no final y firme del proceso de quiebra de dicha parte.

B. Erró y abusó de su discreción el foro de instancia al notificar aviso de subasta y mandamiento de ejecución de sentencia, cuando dicho aviso y mandamiento son nulos, porque no fueron notificados a la parte recurrente o su representante legal (Lcdo. Gierbolini) y dicha falta de notificación permite a la parte recurrente ser relevada de los efectos de tales aviso de subasta y mandamiento de ejecución de sentencia.

C. Erró y abusó de su discreción el foro de instancia al desautorizar la paralización de los procedimientos del caso de epígrafe, cuando el trámite o proceso de quiebra de la parte recurrente no ha advenido final y firme.

---

[51] Íd., entrada núm. 100.
[52] Íd., entrada núm. 102.
[53] Íd., entrada núm. 104.

En primer lugar, sostiene que el recurso de *certiorari* instado ante el Tribunal Supremo en el caso CC-2025-0903 debió incentivar al TPI a paralizar el caso, en vista de que el mismo versa sobre la vigencia del procedimiento de quiebra.

En segundo lugar, arguye **por primera vez** que el aviso de subasta y mandamiento de ejecución de sentencia no satisface las exigencias de la Regla 51.7 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 51.7, puesto que estos no le fueron notificados.

Por último, insiste en que procede la paralización automática de los procedimientos, toda vez que la solicitud de quiebra no ha advenido final y firme.

Posteriormente, el BPPR presentó su *Oposición a Expedición del auto de Certiorari y Solicitud de Desestimación*. De entrada, aduce que el recurso no está contemplado dentro de ninguno de los supuestos que dispone la Regla 52.1 de las de Procedimiento Civil, *supra*, R. 52.1, por lo que procede su desestimación.

Por otra parte, esgrime que el TPI no tenía obligación alguna de paralizar los procedimientos por un recurso pendiente de adjudicación ante el Tribunal Supremo. Añade que el aviso de subasta no fue notificado debido a que las fechas de subastas quedaron canceladas. Reitera además, que las peticiones de quiebra de los señores Padilla Negrón y Sepúlveda Rodríguez fueron desestimadas, por lo que no cabe hablar de paralización automática alguna.

Solicitó además que, se le impongan sanciones y honorarios de abogado a la parte peticionaria y a su abogado, por exhibir una conducta de litigación frívola. Alega que el recurso es un abuso de los mecanismos de revisión judicial, con el único propósito de continuar dilatando los procedimientos ante el TPI.

Resulta meritorio señalar que, el 23 de febrero de 2026, el BPPR presentó una *Moción Informativa* en la que hizo constar que el

auto de *certiorari* presentado por la parte peticionaria ante el Tribunal Supremo, en el caso CC-2025-0903, había sido declarado *No Ha Lugar.*[54]

En adelante, evaluaremos las normas jurídicas atinentes a los errores planteados por la parte apelante.

### III.

### A.

El auto de *certiorari* es un remedio procesal discrecional que permite a un tribunal de mayor jerarquía revisar las determinaciones de un tribunal inferior. ***Medina Nazario v. McNeil Healthcare LLC***, 194 DPR 723, 728 (2016). Es en esencia un recurso extraordinario por el cual se solicita a un tribunal de mayor jerarquía la corrección de un error cometido por el tribunal inferior. supra, pág. 729. Una característica distintiva del auto de *certiorari* es que se asienta en la discreción delegada al tribunal revisor para autorizar su expedición y adjudicación. ***IG Builders et al. v. BBVAPR***, 185 DPR 307, 338 (2012). No obstante, nuestra discreción debe ejercerse de manera razonable, y siempre procurar lograr una solución justa. ***Torres Martínez v. Torres Ghigliotty***, 175 DPR 83, 98 (2008).

Con el fin de que podamos ejercer de una manera sabia y prudente nuestra facultad discrecional, la Regla 40 del Reglamento del Tribunal de Apelaciones*, según enmendada, **In re Aprob. Enmdas. Reglamento TA**,* 2025 TSPR 141, pág. 63, 216 DPR __ (2025), establece los criterios que debemos tomar en consideración al atender una solicitud de expedición de un auto de *certiorari.*[55]

---

[54] Véase Entrada Núm. 5 en el SUMAC-TA.
[55] Esta Regla dispone lo siguiente:
  El Tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:
    (A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
    (B) Si la situación de hechos planteada es la más indicada para el análisis del problema.

Reiteradamente, el Tribunal Supremo de Puerto Rico ha expresado que en su misión de hacer justicia la discreción "es el más poderoso instrumento reservado a los jueces". ***Rodríguez v. Pérez***, 161 DPR 637, 651 (2004); ***Banco Metropolitano v. Berríos***, 110 DPR 721, 725 (1981). La discreción se refiere a "la facultad que tiene [el tribunal] para resolver de una forma u otra, o de escoger entre varios cursos de acción". ***Citibank et al. v. ACBI et al.***, 200 DPR 724, 735 (2018); ***García López y otro v. E.L.A.***, 185 DPR 371, 394 (2012). En ese sentido, ha sido definida como "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera". ***Citibank et al. v. ACBI et al.***, supra; ***Medina Nazario v. McNeil Healthcare LLC***, supra, pág. 729. Lo anterior "no significa poder actuar en una forma u otra, haciendo abstracción del resto del Derecho". ***Hietel v. PRTC***, 182 DPR 451, 459 (2011); ***Pueblo v. Rivera Santiago***, 176 DPR 559, 580 (2009); ***Negrón v. Srio. de Justicia***, 154 DPR 79, 91 (2001); ***Bco. Popular de P.R. v. Mun. de Aguadilla***, 144 DPR 651, 658 (1997). Ello, ciertamente, constituiría un abuso de discreción.

En ese sentido, el Tribunal Supremo de Puerto Rico ha establecido que "la discreción que cobija al Tribunal de Primera Instancia en sus determinaciones discrecionales es amplia, por lo que sus decisiones merecen gran deferencia". ***Citibank et al. v. ACBI et al.***, supra. Cónsono con ello, es norma reiterada que este tribunal no intervendrá "con determinaciones emitidas por el foro

---

(C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

primario y sustituir el criterio utilizado por dicho foro en el ejercicio de su discreción, salvo que se pruebe que dicho foro actuó con prejuicio o parcialidad, incurrió en craso abuso con el ejercicio de la discreción, o que incurrió en error manifiesto". ***Citibank et al. v. ACBI et al.***, supra, pág. 736. Véase, además, ***Trans-Oceanic Life Ins. v. Oracle Corp.***, 184 DPR 689, 709 (2012); ***Lluch v. España Service Sta.***, 117 DPR 729, 745 (1986).

### B.

Para que podamos intervenir en un caso es indispensable que el mismo sea justiciable. ***Torres Montalvo v. Gobernador ELA***, 194 DPR 760, 766 (2016); ***ELA v. Aguayo***, 80 DPR 552 (1958). Lo anterior "requiere que exista una controversia genuina, entre partes antagónicas, que permita adjudicarla en sus méritos y conceder un remedio con efecto real sobre la relación jurídica". ***Torres Montalvo v. Gobernador ELA***, supra. Véase también, ***Asoc. Fotoperiodistas v. Rivera Schatz***, 180 DPR 920, 931 (2011); ***Amadeo Ocasio v. Pierluisi Urrutia***, 211 DPR 278, 284 (2023); ***Hernández Santa v. Srio. De Hacienda***, 208 DPR 727, 738 (2022).

Uno de los factores para determinar si un caso es justiciable, es la norma de academicidad. El fin primordial de esta doctrina es "evitar el uso inadecuado de los recursos judiciales y evitar precedentes innecesarios". ***Super Asphalt v. AFI y otro***, 206 DPR 803, 815-816 (2021); ***Moreno v. U.P.R. II***, 178 DPR 969, 974-975 (2010); ***P.N.P. v. Carrasquillo***, 166 DPR 70, 75 (2005). Según ha establecido nuestro más alto foro, un caso es académico cuando "se trata de obtener un fallo sobre una controversia disfrazada, que en realidad no existe, o una determinación de un derecho antes de que éste haya sido reclamado o una sentencia sobre un asunto, que, al dictarse, por alguna razón no podrá tener efectos prácticos sobre una controversia existente". ***Super Asphalt v. AFI y otro***, supra, pág. 816; ***Asoc. Fotoperiodistas v. Rivera Shatz***, supra, pág. 932;

*Moreno v. U.P.R. II*, supra, pág. 973. De la misma forma, un caso puede tornarse académico por cambios en los hechos judiciales o fácticos que surgen, durante el transcurso del caso. *Super Asphalt v. AFI y otro*, supra; *Anguiera v. J.L.B.P.*, 150 DPR 10, 19 (2000).

Si en efecto un caso se convierte en académico, el tribunal debe abstenerse de considerarlo en los méritos. *Super Asphalt v. AFI y otro*, supra; *Amadeo Ocasio v. Pierluisi Urrutia*, supra, pág. 287. De igual modo, "[c]uando un caso de torna académico, el tribunal revisor tiene el deber de no tan sólo desestimar el recurso apelativo, sino también de dejar sin efecto el dictamen revisado y devolver el caso con instrucciones de que se desestime". *Moreno v. U.P.R. II*, supra, pág. 975. (Énfasis suplido). El propósito de esta norma es prevenir que un dictamen que se tornó académico siga en vigor y obligue a las partes. Íd.

## C.

La quiebra es un procedimiento regido por el Código de Quiebras federal, *supra*, sec. 101 *et seq.,* el cual constituye campo ocupado para evitar conflictos regulatorios entre la legislación federal y estatal. **Const. EE. UU**., Art. I, sec. 8, cl. 4; *Marrero Rosado v. Marrero Rosado*, 178 DPR 476, 490 (2010). El propósito de la quiebra radica en brindarle al deudor la oportunidad de reiniciar su vida financiera, a la vez que se protegen los intereses de los acreedores. *Allende Pérez v. García*, 150 DPR 892, 898 (2000). Para así lograrlo, la Sección 541 del Código de Quiebra, *supra*, dispone para la creación de un caudal en quiebra (*Bankruptcy Estate*) al comienzo de los procedimientos, consistente de toda la propiedad que estará sujeta a la jurisdicción de la Corte de Quiebra (*Bankruptcy Court*). Íd.

En lo pertinente, el Capítulo 13 del Código de Quiebras federal, *supra*, secs. 1301-1330, es el vehículo mediante el cual un individuo se acoge a un plan presupuestario para sus ingresos

futuros en aras de satisfacer sus deudas a los acreedores. Mediante esta protección, el deudor somete a la supervisión de un síndico sus ingresos futuros para su efectiva administración. *SLG Báez-Casanova v. Fernández*, 193 DPR 192, 201 (2015).

De otra parte, la Sección 362 del Código de Quiebras, *supra*, establece la paralización automática (*automatic stay*) de todo procedimiento o su actuación contra una persona o entidad que presenta una petición de quiebra ante la Corte de Quiebras. *BPPR v. SLG Gómez-López*, 213 DPR 314, 330 (2023). Los efectos de la paralización se activan desde que se presenta la petición de quiebra hasta que recaiga la sentencia final y no se requiere notificación formal para que surta efecto. *Peerles Oil v. Hnos. Torres Pérez*, 186 DPR 239, 255 (2012)*; Marrero Rosado v. Marrero Rosado*, supra, pág. 491. Esto también provoca que los tribunales estatales queden privados de jurisdicción automáticamente, e incluso, paraliza litigios que tengan poco o nada que ver con la situación financiera del deudor. *Marrero Rosado v. Marrero Rosado*, supra. La paralización estará vigente hasta tanto el caso presentado se culmine, se desestime o sea descargado, ya sean en los casos que sean al amparo del Capítulo 7, 9, 11, 12 y 13, respectivamente del Código de Quiebras, *supra*, sec. 362(c)(2).

Ahora bien, el Tribunal Supremo ha explicado que dicha protección es exclusiva del deudor que se acoge a la quiebra. En ese sentido, "la responsabilidad de una persona que es codeudor, fiador o en alguna forma garantizador de un quebrado no se altera por la adjudicación en quiebra de éste*". Comisión v. González Freyre et al.*, 211 DPR 579, 599 (2023), citando a *Allied Management Group, Inc. v. Oriental Bank*, 204 DPR 374, 389 (2020).

En esa misma línea, el Código de Quiebras federal establece que el Capítulo 13 solo aplica a deudas de consumo, las cuales son

definidas como aquellas incurridas por un individuo para un propósito primordialmente personal, de familia o del hogar. 11 U.S.C. sec. 101(8). En específico, el referido estatuto dispone como sigue:

> **(a)** Except as provided in subsections (b) and (c) of this section, after the order for relief under this chapter, a creditor may not act, or commence or continue any civil action, to collect all or any part of a consumer debt of the debtor from any individual that is liable on such debt with the debtor, or that secured such debt, unless—
>> **(1)** such individual became liable on or secured such debt in the ordinary course of such individual's business; or
>>
>> **(2)** the case is closed, dismissed, or converted to a case under chapter 7 or 11 of this title.

11 U.S.C. sec. 1301(a)

De conformidad a lo anterior, la paralización automática dispuesta por el Capítulo 13 se hace extensiva a una categoría limitada de individuos codeudores. Huelga apuntar **que dicha paralización no aplica a personas jurídicas**. *In re Cook,* No. 14-20547, 2014 WL 5686272 (Bankr. S.D. Ga. Nov. 4, 2014); *In re Case*, 148 BR 901, 902 (Bankr. W.D. Mo. 1992).

### D.

La Regla 44 de Procedimiento Civil, *supra*, R. 44, establece las normativas que rigen la concesión de costas y honorarios de abogado, así como el interés legal aplicable a estas. En concreto, la Regla 44.1(a), *supra*, R. 44.1(a), define las costas, disponiendo que estas comprenderán "los gastos en que se incurra necesariamente en la tramitación de un pleito o procedimiento que la ley ordena o que el tribunal, en su discreción, estima que una parte litigante debe reembolsar a otra".

Entretanto, la Regla 44.1(d), *supra*, R. 44.1(d), rige los honorarios de abogado, prescribiendo lo siguiente:

> (d) *Honorarios de abogado.* En caso que cualquier parte o su abogado o abogada haya procedido **con temeridad o frivolidad**, el tribunal **deberá** imponerle en su

sentencia al o a la responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta. En caso que el Estado Libre Asociado de Puerto Rico, sus municipios, agencias o dependencias haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia una suma por concepto de honorarios de abogado, excepto en los casos en que esté expresamente exento por ley del pago de honorarios de abogado. (Énfasis nuestro).

De esta norma, se colige que: (1) si un tribunal determina que una parte actuó con temeridad o frivolidad, entonces está obligado a imponerle el pago de honorarios de abogado; y (2) la cuantía impuesta deberá responder a la conducta incurrida.

Para nuestro más alto foro, la imposición de horarios de abogado y su cuantía es un asunto discrecional del tribunal que únicamente puede ser variado ante un abuso de discreción. *SLG González Figueroa v. SLG et al.*, 209 DPR 138, 150 (2022); *SLG Flores Jiménez v. Colberg,* 173 DPR 843, 866 (2008); *Blas v. Hosp. Guadalupe,* 146 DPR 267, 334 (1998). También, haciendo eco de la referida regla, ha reiterado que, <u>si se determina la existencia de temeridad</u>, entonces <u>la imposición del pago de honorarios de abogado es mandatoria</u>. *Colón Santos v. Coop. Seg. Mult. P.R.,* 173 DPR 170, 188 (2008); *Fernández v. San Juan Cement Co., Inc.,* 118 DPR 713, 717 (1987).

Si bien las Reglas de Procedimiento Civil, *supra,* no proveen una definición de temeridad, cabe indicar que tanto el significado, como los contornos de este amplio concepto han sido objeto de extenso estudio por nuestros tribunales. En ese sentido, se concibe que son temerarias las actuaciones de un litigante que: (1) llevan a un pleito que pudo evitarse; (2) provocan la prolongación indebida del trámite judicial; (3) obligan a otra parte a incurrir en gastos innecesarios para defenderse; o (4) dilatan los procedimientos para que no responda por sus obligaciones. *SLG González Figueroa v. SLG et al.,* supra págs. 148 y 149. Asimismo, un litigante que no

salió favorecido actúa con temeridad si obligó a la otra parte a asumir innecesariamente los gastos de un pleito gracias a su "terquedad, testarudez, obstinación, contumacia, empecinamiento, impertinencia e insistencia en una actitud desprovista de fundamentos". Íd., págs. 148-149. Por su parte, académicos como el Dr. José Cuevas Segarra han ofrecido aproximaciones al concepto, reseñando que la temeridad se trata de una actitud que se proyecta sobre el procedimiento, que afecta el buen funcionamiento y la administración de la justicia. J. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, 2da ed., Publicaciones JTS, 2011, T. IV, pág. 1307.

De la mano con estas descripciones, el propósito que se busca con la imposición de honorarios de abogado es castigar a los litigantes que alargan innecesariamente los pleitos ya presentados. Íd. Como ha manifestado nuestro más alto foro, se pretende disuadir la litigación innecesaria y alentar las transacciones, sancionando al temerario de forma tal que se compensen los perjuicios económicos y las molestias sufridas por la otra parte. **Torres Ortiz v. ELA,** 136 DPR 556, 565 (1994).

Igualmente, otras instancias en las que nuestro Tribunal Supremo ha reconocido que una parte actúa temerariamente son cuando: (1) contesta la demanda y niega responsabilidad total, pero posteriormente la acepta; (2) se defiende injustificadamente de la acción; (3) cree que la cantidad reclamada es exagerada y es la única razón que tiene para oponerse a las peticiones del demandante, y no admite su responsabilidad pudiendo limitar la controversia a la fijación de la cuantía a ser concedida; (4) se arriesga a litigar un caso del que se desprende *prima facie* su responsabilidad; y (5) niega un hecho que le consta que es cierto. **C.O.P.R. v. S.P.U.,** 181 DPR 299, 342 (2011); **Blas v. Hosp. Guadalupe,** supra pág. 335; **Fernández v. San Juan Cement Co., Inc.,** supra pág. 719.

Ahora bien, también se ha resuelto que no procede el pago de honorarios de abogado cuando: (1) se plantean controversias complejas y novedosas aún no resueltas; (2) se actúa acorde a una apreciación errónea del derecho y no existen precedentes establecidos sobre el asunto; o (3) existe una desavenencia honesta o discrepancia genuina sobre el derecho aplicable a los hechos del caso. ***VS PR, LLC v. Drift-Wind, Inc.,*** 207 DPR 253, 277 (2021); ***SLG González Figueroa v. SLG et al.***, supra pág. 149; ***Blanco Matos v. Colón Mulero,*** 200 DPR 398, 429 (2018); ***Torres Vélez v. Soto Hernández,*** 189 DPR 972, 994 (2013).

Por último, como la Regla 44.1(d) de Procedimiento Civil, *supra*, no detalla la forma y manera en que debe fijarse la cuantía a imponerse por este concepto, la jurisprudencia también ha señalado el camino y ha dispuesto que los tribunales deben tomar en cuenta: (1) el grado de temeridad; (2) el trabajo realizado; (3) la duración y naturaleza del litigio; (4) la cuantía involucrada; y (5) el nivel profesional de los abogados. ***C.O.P.R. v. S.P.U.,*** supra pág. 342.

## IV.

En su primer señalamiento de error, la parte peticionaria sostiene que el foro primario incidió al no paralizar el caso de epígrafe, a pesar de que existía un recurso de *certiorari* pendiente de adjudicación ante el Tribunal Supremo de Puerto Rico.

De entrada, resulta meritorio puntualizar que nada en el ordenamiento jurídico dispone que un foro inferior viene obligado a paralizar los procedimientos —ya sea a solicitud de parte o *motu proprio*— por el mero hecho de que una de las partes haya presentado una petición de *certiorari* ante un tribunal revisor. En tales circunstancias, el foro primario conserva discreción para dictar el curso a seguir en el caso ante su consideración, sin estar obligado a ordenar la paralización.

Aclarado lo anterior, y tras un análisis objetivo, sereno y cuidadoso del expediente del caso, razonamos que el primer señalamiento de error se tornó académico. Veamos.

En particular, mediante el referido señalamiento de error, la parte peticionaria hace referencia a la petición de *certiorari* presentada ante el Tribunal Supremo el 17 de diciembre de 2025, en el caso CC-2025-0903. Al momento de presentarse el recurso que nos ocupa, dicha petición aún se encontraba pendiente ante la consideración del máximo foro. No obstante, conforme fue informado por la parte recurrida mediante la *Moción informativa* del 23 de febrero de 2026[56], el Tribunal Supremo denegó la expedición del auto de *certiorari* mediante *Resolución* emitida el 13 de febrero de 2026, notificada el 19 de febrero de 2026.

Así, la controversia relativa a si el foro primario debió paralizar los procedimientos mientras el referido recurso se encontraba ante la consideración del Tribunal Supremo perdió vigencia y, consecuentemente, se tornó académica. Por ende, carecemos de jurisdicción para atender dicho señalamiento.

En su segundo señalamiento de error, la parte peticionaria sostiene que el aviso de subasta es nulo, toda vez que no le fue notificado conforme a las exigencias de la Regla 51.7 de Procedimiento Civil, *supra.* Sin embargo, surge del expediente que dicho argumento fue formulado por **primera vez** ante esta Curia. Es decir, a la fecha de presentación del recurso que nos ocupa, tal planteamiento no había sido presentado ante el TPI.

Como es sabido, un foro revisor está impedido de resolver planteamientos que no fueron presentados ante la consideración del tribunal inferior. Véanse, entre otros, ***Toro Rivera et als. v. ELA et al.,*** 193 DPR 393, 404 (2015); ***Ortiz v. Holsum,*** 190 DPR 511

---

[56] Véase Entrada Núm. 5 en el SUMAC-TA.

(2014); *E.L.A. v. Northwestern Selecta*, 185 DPR 40 (2012). Las partes no pueden esgrimir nuevos asuntos o incluir prueba documental ante el foro apelativo por primera vez. Íd.; **Cfr.** *Const. José Carro v. Mun. Dorado*, 186 DPR 113, 129 (2012). En atención a ello, estamos impedidos de considerar el segundo señalamiento de error.

En su tercer señalamiento de error, la parte peticionaria insiste una vez más en que el foro primario erró al no paralizar los procedimientos, puesto que, según alega, el trámite de quiebra de instado por los señores Padilla Negrón y Sepúlveda Rodríguez no ha advenido final y firme. No le asiste la razón.

De una lectura cuidadosa del expediente, se desprende que las referidas peticiones de quiebra bajo el Capítulo 13 del Código de Quiebras, *supra*, fueron instadas por los señores Padilla Negrón y Sepúlveda Rodríguez en su carácter personal. Surge además del expediente que, en el presente caso, la deuda objeto de litigio es de naturaleza comercial.

Según reseñado en el derecho que precede, la paralización automática que surge al presentarse una petición de quiebra opera **únicamente** en beneficio del deudor que se acoge a dicho procedimiento. *Comisión v. González Freyre et al.*, supra, citando a *Allied Management Group, Inc. v. Oriental Bank*, supra.

Más aún, las disposiciones del Capítulo 13 del Código de Quiebras, *supra*, **no** son extensivas a personas jurídicas. *In re Cook,* No. 14-20547, 2014 WL 5686272 (Bankr. S.D. Ga. Nov. 4, 2014); *In re Case*, 148 BR 901, 902 (Bankr. W.D. Mo. 1992). En ese sentido, dicha protección no se extiende a terceros ni a personas jurídicas. Además, el Código de Quiebras establece puntualmente que el Capítulo 13, *supra*, se limita a deudas de consumo, y no abarca deudas comerciales. 11 USC sec. 1301(a).

A tenor con todo lo anterior, resulta forzoso concluir que la paralización automática invocada por la parte peticionaria, de ninguna manera, es extensiva a Challenger Brass. Así, y toda vez que la propiedad sujeta a ejecución en el presente caso es propiedad exclusiva de Challenger Brass, los procedimientos post-sentencia en cuanto a esta podían continuar.

Adviértase además que, aun en el supuesto de que la paralización automática fuese extensiva a Challenger Brass, lo cual negamos, surge del expediente que ambas peticiones de quiebra presentadas por los señores Padilla Negrón y Sepúlveda Rodríguez <u>fueron desestimadas por el Tribunal de Quiebras</u>.[57] Conforme dispone el propio Código de Quiebras, la paralización automática en estos casos permanece vigente **hasta** que el caso se cierre, se **desestime** o se conceda la descarga correspondiente. 11 U.S.C. sec. 362(c)(2). Al haberse desestimado las peticiones, tampoco subsiste paralización automática alguna que impida la continuación de los procedimientos en el caso de autos contra todos los peticionarios.

Por todo lo cual, resolvemos que la determinación del foro primario de continuar con los procedimientos post-sentencia en el caso es esencialmente correcta en derecho, y el tercer señalamiento de error no fue cometido.

Por último, razonamos pertinente señalar que el trámite procesal del presente caso refleja múltiples gestiones de la parte peticionaria dirigidas a cuestionar dictámenes sobre el mismo asunto de forma repetida, a pesar de haber sido resueltos previamente. A juicio de este Tribunal, tales gestiones constituyen un intento de la parte peticionaria en dilatar los procedimientos en el caso, lo que resulta en una conducta frívola. Adviértase que en el presente caso, existe una *Sentencia por Consentimiento Nunc Pro*

---

[57] Íd., entradas núm. 76 y 102 en el SUMAC-TPI.

*Tunc* que fue dictada el <u>9 de enero de 2024</u>, la cual aún no ha podido ser ejecutada. La contumacia e insistencia de la parte peticionaria ha obligado al BPPR y a los foros judiciales a asumir gastos e inconvenientes innecesarios en el pleito. En consecuencia, procede la imposición de honorarios de abogado por temeridad, de conformidad a la Regla 44.1 de Procedimiento Civil, *supra.*

**V.**

Por los fundamentos pormenorizados, se expide el auto de *certiorari* y se confirma la determinación recurrida. Se impone a la parte peticionaria el pago de **$3,000 de honorarios de abogado por temeridad**, los que deberá consignar en el Secretaría del TPI bajo el número del caso que allí se ventila entre las partes. Tiene veinte (20) días para ello, contados a partir de que la presente *Sentencia* advenga final y firme.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones